IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CIV-00-2092-L |
| | ) | |
| TOMMY D. DAVENPORT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OPINION

On December 19, 2000, plaintiff filed this action to reduce tax assessments for tax years 1990 through 1993 to judgment and to foreclose federal tax liens against real property[1] held by defendants Tommy D. and Linda Jean Davenport ("Davenports"). On October 18, 2005, the court entered partial summary judgment in favor of plaintiff, holding that the Internal Revenue Service ("IRS") lien for tax year 1990 attached to the property at issue in this case on April 18, 1994. The court found genuine issues of material fact existed with respect to plaintiff's claim that the Davenports' transfers of property to various trusts constitute fraudulent conveyances. The court also declined to rule on plaintiff's claim that the trusts are nominees of the Davenports.

---

[1]Legal descriptions of the property at issue are attached to this Memorandum Opinion as Court's Exhibit 1.

This matter was tried to the court without a jury on November 14-18, 2005. Prior to trial, the parties settled all issues regarding tax year 1991.  With respect to 1990, the parties settled all issues except the amount of income due to cancellation of indebtedness, whether that income was capital or ordinary income, and whether the Davenports could take a worthless stock deduction.  The only issue remaining with respect to tax years 1992 and 1993 is the Davenports' filing status.  The IRS calculated the Davenports' tax liability for those years using a filing status of "married filing separately"; the Davenports contend the filing status should be "married filing jointly." The final issue for decision concerns the effect of the Davenports' transfer of property to various trusts in 1994.  In accordance with Fed. R. Civ. P. 52(a), this memorandum opinion constitutes the court's findings of fact and conclusions of law on the remaining issues.

The evidence demonstrates the Davenports timely filed federal income tax returns for 1990 and 1991.  Plaintiff's Exhibits 41, 47.  In February 1993, the IRS began an audit of the Davenports' 1990 income tax return.  On February 5, 1993, Kent Brown, an IRS revenue agent, contacted Mrs. Davenport to discuss the audit and to schedule an appointment.  The IRS also sent a letter to the Davenports notifying them of the examination and a prescheduled February 26, 1993 meeting; the letter also requested the Davenports provide substantiating documents. Plaintiff's Exhibit 26.  On February 22, 1993, Mrs. Davenport requested that the February 26, 1993 meeting be rescheduled because she had been ill and had been unable to

gather documents from storage.    On March 19, 1993, Brown contacted Mrs. Davenport to confirm the rescheduled meeting.  Mrs. Davenport informed Brown that the Davenports would not attend the meeting, nor would they provide the requested documents.      Mrs.   Davenport   referred   Brown   to   the   taxpayers'   written correspondence.  This correspondence included a document executed March 15, 1993 entitled "Demand for Jurisdiction/Authority, Information from Internal Revenue Service, and Notice of Challenge and Disclaimer of Same", which asked the IRS to inform the Davenports of its jurisdictional authority.  Plaintiff's Exhibit 28 at 1-4.  The Davenports indicated they "rescind[ed] any and all signatures we have placed upon any and all documents which are in effect with your agency." Id. at 2.  In addition, the Davenports separately revoked all "U.S. Individual Income Tax returns, forms 1040 and attachments" ever filed with the IRS; Mr. Davenport's revocation was for tax years 1949 through 1992, while Mrs. Davenport revoked returns filed from 1955 through 1992.  Id. at 5, 6.  Also on March 15, 1993, the Davenports revoked the powers of attorney given to their attorney, Michael L. Teter, and their accountant, Robert Call, to represent them before the IRS.  Plaintiff's Exhibit 29 at 2, 3.  The IRS received these documents on March 22, 1993.  Id. at 1.

Because the Davenports did not provide the IRS with any documentation supporting their 1990 return, Brown assumed the deductions reflected in the return were unverified.  Given the revocation of the powers of attorney, Brown could not contact the Davenports' attorney or accountant to discuss the audit issues.  On

October 21, 1993, the IRS issued a statutory notice of deficiency to the Davenports.

Plaintiff's Exhibit 42.   In their 1990 tax return, the Davenports had included

$291,149.76 as capital income based on forgiveness of $486,092.02 in debt by the

Federal Deposit Insurance Corporation ("FDIC").   The IRS, however, treated the

entire $486,092 as ordinary income and recalculated the tax owed accordingly.   Id.

at 6.   In addition, the IRS disallowed the Davenports' deduction for capital losses

based on worthless stock of two corporations, Frac Tanks, Inc. and Shelly Operating

Company.   Id.   On April 18, 1994, the IRS issued an assessment against the

Davenports for federal income taxes, penalties, and interest for tax year 1990.

Plaintiff's Exhibit 74 at 2.   On August 10, 1994, the IRS filed notice of its tax lien

based on this assessment with the Register of Deeds of the County Clerk of Payne

County, Oklahoma.   United States v. Davenport, Case No. CIV-00-2092-L, order at

2 (W.D. Okla. Oct. 18, 2005) (Doc. No. 138).

On August 1, 1994, the IRS issued a letter to the Davenports notifying them

their 1992 tax return was overdue.   Plaintiff's Exhibit 115.   When no returns were filed

for tax years 1992 or 1993, the IRS prepared substitutes for returns for those years.

Although the substitute returns are not of record, Brown testified that the returns were

prepared with a filing status of married filing separately and the notices of deficiency

for those years reflect that status.   See Plaintiff's Exhibit 49 at 23; Plaintiff's Exhibit

50 at 16.   Brown indicated this is standard IRS procedure because married filing

jointly is an election that must be made by the taxpayers and where no return is filed,

that choice has not been made.  There is no dispute the Davenports were married to

each other at all times during 1992 and 1993 and remain so today.

In September and October 1988, the FDIC began collection efforts against the

Davenports for loans made by Citizens Bank of Krebs, First State Bank of Oilton, and

Citizens Bank of Drumright.  Defendants' Exhibit 9N.  The Davenports, through their

attorney Michael L. Teter, entered into negotiations with the FDIC to resolve the

outstanding indebtedness.  As part of that effort, Teter prepared a written proposal

that was transmitted to the FDIC on January 20, 1989.  Plaintiff's Exhibit 43.  Included

within the proposal was a balance sheet dated December 31, 1988, which reflected

the Davenports had a negative net worth of $266,245.40.  Id. at 182.  The balance

sheet reflected a zero value for the stock of Frac Tanks, Inc. and Shelly Operating

Company and a total fair market value of the Davenports' real estate holdings of

$456,750.00.  Id. at 184-86.  While the Davenports' determination of the fair market

value of the 27 parcels was not supported by appraisals, the undisputed evidence

established the FDIC had the properties appraised.  In 1990, the Davenports and

FDIC reached a settlement under which the Davenports paid the FDIC $220,000.00

in cash.  In return, the FDIC forgave debt totaling $563,176.89.[2]  Defendants' Exhibit

7N.  Of the $220,000.00 paid, the FDIC allocated $142,915.13 to interest payments,

---

[2]Defendants' Exhibit 7N contains an adding error.  The correct amount of debt forgiven is $563,176.89 instead of the $563,176.88 listed on the worksheet.

leaving a principal amount paid of $77,084.87.  Id.  Thus, the Davenports' forgiven

debt was $486,092.02.  Id.

Section 108 of the Internal Revenue Code provides that:

> Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if . . . the discharge occurs when the taxpayer is insolvent.

26 U.S.C. § 108(a)(1)(B).  Pursuant to this section, the Davenports were permitted

to exclude from income cancellation of indebtedness income up to the amount by

which they were insolvent.  26 U.S.C. § 108(a)(3).  The Code defines insolvency as

"the excess of liabilities over the fair market value of assets" as of the date

immediately prior to the discharge.  26 U.S.C. § 108(d)(3).  Using the Davenports'

September 15, 1989 balance sheet, Robert Call determined the Davenports' net

worth before forgiveness was negative $194,942.25.[3]  Defendants' Exhibit 8X at 1,

7.  Call then deducted this negative net worth from the forgiven debt to arrive at the

amount of income due to forgiveness to declare on the Davenports' 1990 tax return.

*See* Defendants' Exhibit 7N.  Call treated the debt forgiveness income as capital

income because the underlying notes concerned income-producing properties.

---

[3]Call reduced the Davenports' liabilities by $40,530.65 to reflect amount of the notes actually forgiven by the FDIC.  *Compare* Defendants' Exhibit 7N *with* Defendants' Exhibit 8X at 7.  He made no adjustments to the Davenports' calculation of their assets; thus, he subtracted liabilities of $774,412.95 from assets of $579,470.70 to arrive at a negative net worth of $194,942.25.

On audit, the IRS rejected Call's calculations and declared the entire amount of forgiven debt to be ordinary income.  Plaintiff argues the Davenports were not entitled to an adjustment under 26 U.S.C. § 108(a)(3) because they were not insolvent immediately prior to the discharge of indebtedness.  In support of this assertion, plaintiff offered the testimony and expert report of David Payne and Marion Kordic.  In their expert report, Payne and Kordic attempted to place a retrospective value of $956,200.00 on 24 of the 27 real estate parcels listed on the Davenports' balance sheet.[4]  The court finds the Payne and Kordic valuation to be unreliable and flawed in several key respects.  First, Payne and Kordic gave "significant weight" to appraisals performed by real estate broker Dorothy Meyers in June 1989.  The Meyers' appraisals, however, are devoid of any support and thus are unreliable.  Kordic admitted Meyers' appraisals are not appraisals in the true sense of the word, but rather constitute a broker's opinion as to the worth of the properties.  He also admitted the opinions are unsubstantiated and, in fact, Meyers lists no comparables or other information that corroborate her valuations.  *See* Defendants' Exhibit 12T.  Second, Payne and Kordic considered as comparables many sales that occurred more than three years after the valuation date of March 21, 1990, including a number of sales that occurred more than ten years after the valuation date.  *See* Plaintiff's Exhibit 98 at BVA-86, BVA-102, BVA-105, BVA-109, BVA-110, BVA-115.  Use of

---

[4]No attempt was made to value the undeveloped lot in Taos, New Mexico, the Wildhorse Ranch Timeshare in Teller County, Colorado, or the 12.5 percent overriding royalty interest in three oil or gas leases in Payne County, Oklahoma.

sales data that far removed from the valuation date renders the resulting opinion unreliable particularly given the admittedly depressed real estate market in the Cushing and Drumright, Oklahoma area in 1990. The market was hampered not only by a glut of real estate for sale during that time frame, but also by the fact that banks had very little capital to loan. *See* Defendants' Exhibit 14J at 4 ("The FDIC and [Resolution Trust Corporation] were active in the late 1980s and early 1990s in liquidating properties from large bank portfolios. The ability to sell the 36 property inventory held by the Davenports would have been materially impacted by the lack of investment capital and oversupply of investment real estate in March 1990.")

The court finds the best indicator of the value of the subject properties is the value placed on them by the Davenports coupled with actual sales prices received for the properties within three years of the valuation date. The court notes that the FDIC, which had access to appraisals of the properties, settled with the Davenports based on the balance sheet values. Sales prices are the quintessential indicator of fair market value as they represent the price agreed to by a willing buyer and a willing seller. Use of these figures results in a total valuation for the 27 properties of

$608,050.00[5] and a corresponding net worth for the Davenports of negative

$43,642.25.[6]  Thus, income due to debt forgiveness equals $442,449.77.[7]

The Code provides that forgiveness of debt constitutes income, but does not

specify whether that income is ordinary or capital.  26 U.S.C. § 61(a)(12).  Capital

income, however, is defined as "gain from the sale or exchange of a capital asset".

26 U.S.C. § 1222.  The court finds the Davenports' forgiveness of debt income

constitutes ordinary income as no capital assets were transferred or sold to the FDIC.

The Davenports' assertion that the settlement with the FDIC resulted in a

"hypothetical" foreclosure of their property is without merit.

The Davenports claimed two worthless stock deductions in 1990 for their

investments in Frac Tanks, Inc. and Shelly Operating Company.

> Section 165(g) of the Internal Revenue Code (IRC)
> authorizes a deduction for a loss from a worthless security,
> including stock in a corporation.  26 U.S.C. § 165(g)(2)(A).
> A taxpayer may deduct a Section 165(g) loss "only for the
> taxable year in which the loss is sustained." Treas. Reg. §
> 1.165-1(d)(1).  The Supreme Court has ruled that "the

[5]The court accepted the Davenport's values with respect to Parcel Nos. 1, 3-8, 10-12, 16-17, 19-20, 22-27.  With respect to Parcel 2, the court combined the Davenports' value with the sale price received for 8.95 acres of the 77 acre parcel for a total valuation of $78,950.00.  Parcel 9 was sold in 1991 for $138,000.00, which the court finds is the best indication of its fair market value as of March 1990.  Parcel 14 was sold for $5,500, while Parcels 15 and 18 sold for $3,500.00 and $900.00 respectively.  With respect to Parcel 18, Kordic ignored the sale in May 1990 and valued it based on a sale that occurred in 1998.  Parcel 21 was sold by the Davenports in January 1990 for $13,000.00.

[6]*See* Defendants' Exhibit 8X.  As plaintiff only contested the real property valuation, the court accepted the other figures contained on Defendants' Exhibit 8X.  This results in total assets of $730,770.70, which the court subtracted from Call's calculation of total liabilities of $774,412.95.

[7]*See* Defendants' Exhibit 7N.  The court subtracted the negative net worth ($43,642.25) from the forgiven debt ($486,092.02).

question of whether a particular corporate stock did or did not become worthless during a given taxable year is purely a question of fact" to be determined by the court. *Boehm v. Commissioner*, 326 U.S. 287, 293, 66 S. Ct. 120, 90 L. Ed. 78 (1945). *See Delk v. Commissioner*, 113 F.3d 984 (9th Cir. 1997); *Favia v. Commissioner*, T.C.M. 2002-154, 2002 WL 1332810 (U.S. Tax Ct.) (2002).

In order to support a deduction, the claimed loss must be evidenced by "closed and completed transactions" and fixed by "identifiable events," all of which actually occurred during the taxable year. Treas. Reg. § 1.165-1(b). The former Board of Tax Appeals formulated a two-prong test for determining whether a security has become worthless. First, the stock must have no current liquidating value; and second, it must have no potential future value. *Sterling Morton v. Commissioner*, 38 B.T.A. 1270, 1278-1279, 1938 WL 165 (1938), *aff'd*, 112 F.2d 320 (7th Cir. 1940). The taxpayer must demonstrate this loss of value by a preponderance of the evidence. *Id. See Cole v. Commissioner*, 871 F.2d 64 (7th Cir. 1989); *Estate of Mann*, 731 F.2d 267 (5th Cir. 1984).

As long as the stock has any value whatsoever, either present or potential, a taxpayer may not claim a deduction. *Miami Beach Bay Shore v. Commissioner*, 136 F.2d 408, 409 (5th Cir. 1943). A corporate stock is not worthless until the last vestige of value has disappeared. However, a "mere hope," or a "remote hope" that there may be some recovery will not preclude its deduction as worthless. *Halliburton Co. v. Commissioner*, 946 F.2d 395 (5th Cir. 1991); *United States v. S.S. White Dental Mfg. Co.*, 274 U.S. 398, 399-400, 47 S. Ct. 598, 71 L. Ed. 1120 (1927). A mere shrinkage in the value of stock owned by the taxpayer, even though extensive, does not give rise to a deduction under Section 165 if the stock has any recognizable value on the date claimed as the date of loss. Treas. Reg. § 1.165-4(a).

An "identifiable event" includes such decisions as to liquidate or terminate a business to sustain a worthless stock deduction. *Genecov v. United States*, 412 F.2d 556

(5th Cir. 1969); *Gowen v. Commissioner*, 65 F.2d 923 (6th
Cir. 1933).

In re Steffen, 294 B.R. 388, 393 (Bankr. M.D. Fla. 2003).

In this case, there is no question the stock of the two companies was worthless; the issue is one of timing and the amount of the deduction.  Based on the standards enunciated above and the evidence presented, the court finds the Davenports have sustained their burden of establishing the stock became worthless in 1990.  Prior to that date, both companies had – albeit limited –  income-producing assets and accounts receivable.  The decision to treat the settlement with the FDIC as the required "identifiable event" was reasonable as the settlement included loans to Shelly Operating Company.  *See* Plaintiff's Exhibit 43 at 181.

The court further finds the Davenports have substantiated their basis in the stock.  Given that the Davenports' records were destroyed by a flood in May 1993, Call's work papers constitute the best evidence to determine the Davenports' basis in the stock.  Call testified the amount deducted equals the Davenports' initial investment plus loans made to the companies.  Defendants' testimony as to the fact of and the amount of the loans made to the companies was unrebutted and uncontradicted.

The final issue with respect to the tax returns is whether the IRS correctly calculated the Davenports' 1992 and 1993 taxes based on a filing status of married filing separately.  Plaintiff asserts that, pursuant to 26 U.S.C. § 6020(b),  the IRS filed substitutes for returns for the Davenports for the years in question.  Section 6020(b)

permits the IRS to make such returns if the taxpayer does not and provides that "[a]ny return so made *and subscribed by the Secretary* shall be prima facie good and sufficient for all legal purposes."  26 U.S.C. § 6020(b)(2) (emphasis added).  Plaintiff argues the substitute returns constitute the Davenports' filing of separate returns within the meaning of 26 U.S.C. § 6013.  It contends, therefore, the Davenports are now precluded from electing to file joint returns because more than three years have passed from "the last date prescribed by law for filing the return for such taxable year".  26 U.S.C. § 6013(b)(2).

Plaintiff, however, did not provide the court with copies of the substitute returns so the court cannot determine if they were properly prepared.  Furthermore, although documents attached to the notices of deficiency contain sufficient information from which to calculate the Davenports' tax liability, these documents are not subscribed as required by § 6020(b).  *See* Plaintiff's Exhibit 49 at 8; Plaintiff's Exhibit 50 at 7. The IRS attached Form 45498-CG and accompanying schedules to the notices of deficiency.   Although  page  2  of  this  form  contains  a  place  for  the  Examiner's Signature and Date, neither form is dated or signed.  They therefore do not constitute returns filed by the Commissioner. *See* Smalldridge v. Commissioner, 804 F.2d 125, 128 n. 3 (10th Cir. 1986).   This failure of proof is fatal to plaintiff's argument. Because – based on the record before the court – no returns have been filed, section 6013(b)'s three-year limitation does not apply.  The Court's analysis in Phillips v. Commissioner, 851 F.2d 1492 (D.C. Cir. 1988), is directly on point.

[T]he plain words of the statute clearly extend the § 6013(b) limitations only to taxpayers who have previously filed returns.

Section 6013 is written in the form of a general rule and a series of specific exceptions to that rule. The general rule is laid out in § 6013(a): that a husband and wife may choose to file either a separate or a joint tax return. The statute then imposes two sets of limitations on that right. The first set of limitations, contained in section (a), applies generally to all taxpayers. It is clear and uncontested that none of those limitations applies in the case at bar. The second set of limitations, those contained in section (b), applies only to a smaller subset of taxpayers: those filing, as the section heading states, a "[j]oint return after filing separate return." 26 U.S.C. § 6013(b). Congress could readily have extended the § 6013(b) limitations to taxpayers who had not filed any returns at all and were then served with a notice of deficiency, but it is clear from the statute's wording that it did not.

Phillips, 851 F.2d at 1497.

The final issue for decision is whether the Davenports' transfer of their real and personal property to various trusts constitutes a fraudulent transfer. Fraudulent transfers are controlled by state law. Commissioner v. Stern, 357 U.S. 39, 45 (1958); American Bonding Co. of Baltimore v. Hord, 98 F.2d 350, 352 (8th Cir. 1938). If a conveyance is void under state law, the federal tax lien attaches to the subject property by operation of 26 U.S.C. § 6321 and the lien may be foreclosed by a sale of the property in accordance with § 7403 of the Code. United States v. Ressler, 433 F. Supp. 459, 463-65 (S.D. Fla. 1977), aff'd 576 F.2d 650 (5th Cir. 1978).

In Oklahoma, a transfer is fraudulent to a creditor, whether the debt arose before or after the transfer, if the transfer was made with actual intent to hinder, delay

or defraud a creditor.  24 O.S. § 116(A)(1).  A transfer can also be fraudulent if the transfer was made without receiving a reasonably equivalent value in exchange for the transfer and the debtor reasonably believed that he would incur debts beyond his ability to pay as they became due.  24 O.S. § 116(A)(2)(b).  In determining actual intent, the court may consider whether (1) the transfer was to an insider; (2) the transferor retained possession of the property; (3) the transfer was substantially all of the debtor's assets; (4) the debtor received reasonably equivalent value for the property; (5) the debtor became insolvent as a result of the transfer; and (6) the transfer occurred shortly before or after a substantial debt was incurred.  24 O.S. § 116(B).  A transfer is fraudulent as to a creditor whose claim arose before the transfer if the debtor did not receive a reasonably equivalent value for the transfer and the debtor was insolvent or became insolvent as a result of the transfer.  24 O.S. § 117(A).  A debtor is insolvent if the sum of his debts exceeds a fair valuation of his assets.  24 O.S. § 114(A).

In March 1993, the Davenports established a number of trusts including the LJ Trust, the P&L Trust, the L&J Trust, the Pond Trust, the TD Trust (collectively "the property trusts"), the Rolling Trust, and the Consolidated Trust.  *See* Plaintiff's Exhibits 2, 3, 4, 5, 6, 8, and 14.  The trust documents were prepared by Kenton Whitham, who the Davenports met at a meeting they attended in Tulsa, Oklahoma. Mr. Whitham was introduced to the Davenports by other attendees as a man who prepared trusts.  The Davenports had no prior relationship with Mr. Whitham and

knew nothing of his education or legal training.  Regardless, the Davenports did not consult with either their attorney or their accountant, with whom they had had long-standing relationships, about reviewing the trust documents Mr. Whitham prepared.

The trustees and initial beneficiaries of the trusts are the Davenports; the grantor is listed as Fannie Louise Roscoe, who did not own any interest in any of the properties ultimately transferred to the trusts.  In addition, although Mrs. Davenport testified they created the trusts for estate planning purposes, three of the property trusts[8] and the Rolling Trust designate the Consolidated Trust as the beneficiary upon the Davenports' deaths.   The Davenports are the sole beneficiaries of the Consolidated Trust.  That trust, however, contains no provision for distribution of its assets – including the assets it receives from the other trusts – upon the Davenports' death.  The court finds the estate planning justification for creation of the trusts is a sham.

Although the trust documents were executed on March 16, 1993, no real estate was transferred to the property trusts until after the IRS issued its assessment against the Davenports for federal income taxes, penalties, and interest for tax year 1990.[9]  On May 23, 1994, when the Davenports quit-claimed three parcels of land at

---

[8]The LJ Trust and the T&J Trust list the Consolidated Trust as the sole successor beneficiary.  Plaintiff's Exhibit 2 at ¶ 4.1; Plaintiff's Exhibit 6 at ¶ 4.1.  The TD Trust specifies that Judith Briley shall receive a gift of the property at 200 E. Broadway, Drumright, Oklahoma, and the remaining property shall pass to the Consolidated Trust.  Plaintiff's Exhibit 5 at ¶ 4.1.

[9]The statutory notice of deficiency for tax year 1990, reflecting an assessed amount of $201,719.00, was mailed to the Davenports on October 23, 1993.

issue in this case to various trusts,[10] they were aware not only of this assessment, but also of the fact that the IRS was auditing their 1991 tax return.  On June 27, 1994, the IRS issued a statutory notice of deficiency for tax year 1991, asserting the Davenports owed additional tax and penalties of $110,131.00 for that year.  Plaintiff's Exhibit 48.  On August 10, 1994, the IRS filed notice of its tax lien with the Register of Deeds of the County Clerk of Payne County, Oklahoma; five days later, the Davenports quit-claimed three additional parcels of land to the PL Trust and the Pond Trust.  *See* Plaintiff's Exhibits 3 and 4.  Seven of the eighteen quit-claim deeds were recorded on August 15, 1994.

In 1994, the Davenports only significant assets were their real estate holdings, their vehicles, and their buffalo herd.  Nonetheless they conveyed all of their real estate to the property trusts, their vehicles to the Rolling Trust, and their buffalo to the T Bar D Trust.  In addition, they transferred all income to the Consolidated Trust bank account.  The Davenports admit they did not receive any money or property in exchange for the transfer of their assets to these trusts.  Furthermore, the Davenports had complete authority and control over the trusts; they made all the decisions for the trusts and were the only ones who enjoyed, used, or managed the trusts' only assets. In fact, the Davenports have continued to treat the real estate as their own since the time of the conveyances.  They continue to reside on Parcel 3 without paying rent to

---

[10]The property was quit-claimed to the LJ Trust, the TD Trust, and the T&J Trust.  *See* Plaintiff's Exhibits 2, 5, and 6.

the trust and continue to operate the rentals on the other parcels as they did prior to the purported conveyances.  In addition, the Davenports have used the Consolidated Trust bank account to pay their personal expenses.  *See* Plaintiff's Exhibit 95.

The court finds the transfers of Parcels 1 through 6 to the property trusts have the following indicia of actual fraud:  (1) the transfers were to trusts that were controlled by the Davenports as trustees; (2) the Davenports retained control of the property; (3) the Davenports did not receive any value, much less reasonably equivalent value, for the transfers; (4) all of the transfers occurred after the 1990 deficiencies were assessed and three of the transfers occurred after the Davenports had received notices of deficiency for tax years 1990 and 1991; and (5) a number of the quit-claim deeds were not registered until after the IRS filed its notice of tax lien.

Constructive fraud under § 117(A) only requires a showing that the transfer was made without receiving reasonably equivalent value and the debtor was insolvent at the time of the transfer or was made insolvent by the transfer. Considering the amounts assessed for tax year 1990 alone, coupled with the Davenports' outstanding loans of $232,229, the Davenports were made insolvent by the transfer of all their real estate, income, vehicles, and livestock – essentially all of their assets – to the trusts.  Additionally, the court finds the conveyances in 1994 were made at a time when the Davenports were liable to the United States for income tax liabilities. Despite the conveyances, the Davenports have never relinquished the control, benefits or enjoyment of the subject property.  It is evident that the sole

purpose for the conveyances was to hinder, delay or defraud the Davenports' creditors, including the IRS.[11]  Viewed collectively, the facts demonstrate that the transfers were made with fraudulent intent, and thus should be set aside.  Based on this ruling, the court need not determine whether the trusts are the Davenports' nominees.

In sum, the court finds: (1) the Davenports are entitled to exclude $43,642.25 from income due to the FDIC's cancellation of debt in 1990; (2) the Davenports' cancellation of indebtedness income in 1990 is $442,449.77; (3) the cancellation of debt income constitutes ordinary, not capital, income; (4) the Davenports are entitled to a worthless stock deduction in 1990 in the amount stated in their return; (5) the Davenports are entitled to elect a filing status of married filing jointly for tax years 1992 and 1993; and (6) the Davenports' transfer of the property subject to the IRS tax liens was fraudulent.  Plaintiff is directed to submit a proposed judgment to the court that incorporates the court's rulings in this Opinion; the Clerk's entry of default as to defendants PL Trust, Pond Trust, T&J Trust, TD Trust; the default of defendant Patsy Payne; and the parties' settlement.  The proposed judgment shall be submitted no later than **January 17, 2006**.

It is so ordered this   28th   day of December, 2005.

---

[11]This conclusion is buttressed by the fact that the property trusts, Rolling Trust, and Consolidated Trust all recite that they are "NOT subject to taxation under Subtitle A; IRS jurisdiction is therefore denied."  Plaintiff's Exhibit 2 at ¶ 1.1; Plaintiff's Exhibit 3 at ¶ 1.1; Plaintiff's Exhibit 4 at ¶ 1.1; Plaintiff's Exhibit 5 at ¶ 1.1; Plaintiff's Exhibit 6 at ¶ 1.1; Plaintiff's Exhibit 8 at ¶ 1.1; Plaintiff's Exhibit 14 at ¶ 1.1 (emphasis in original).

TIM LEONARD
United States District Judge